# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DUILIO ANGELINI** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 17-4133** |
| **v.** | : | |
| | : | |
| **U.S. FACILITIES, INC.** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                          JULY 16, 2020

## MEMORANDUM OPINION

**INTRODUCTION**

      Duilio Angelini ("Plaintiff") filed an amended employment discrimination complaint against his former employer, U.S. Facilities, Inc. ("Defendant" or "USF"), in which he asserted claims of unlawful discrimination and hostile work environment in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §623 *et seq*. (the "ADEA"), the Pennsylvania Human Relations Act, 43 Pa  Con. Stat. §951 *et seq*. (the "PHRA"), and the Philadelphia Fair Practices Ordinance, §9-1100 *et seq*. (the "Philadelphia Ordinance").  [ECF 4]. Plaintiff also asserted state law claims for wrongful discharge under the Pennsylvania Whistleblower Law, 43 Pa. Con. Stat. §1421, and Pennsylvania common law.  On June 27, 2018, this Court dismissed all of Plaintiff's claims except his age-based discrimination and Whistleblower claims.

      Presently before this Court is Defendant's motion for summary judgment with respect to Plaintiff's remaining claims, filed pursuant to Federal Rule of Civil Procedure ("Rule") 56.  [ECF

32].  Plaintiff opposes the motion.  [ECF 33].[1]  The issues presented in the motion are fully briefed and, therefore, this matter is ripe for disposition.  For the reasons set forth herein, Defendant's motion for summary judgment is granted, and judgment is entered in favor of Defendant on Plaintiff's age-based discrimination and Whistleblower claims.

## BACKGROUND

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant; here, Plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  The facts relevant to the underlying motion are summarized as follows:[2]

Defendant is a national facilities management company headquartered in Philadelphia.  At the relevant time, Defendant was the Operations, Maintenance & Support Services (OM&S) Contractor for the "Triplex" buildings owned by the City of Philadelphia (the "City"); *to wit*:  the Municipal Services Building ("MSB"), the One Parkway Building ("OPB"), and the Criminal Justice Center ("CJC").  Defendant provided services to the City pursuant to a fixed-rate, written contract, the Request for Proposal for Operations, Maintenance & Support Services for the City of Philadelphia Triplex Facilities (the "RFP").  Consistent with the RFP, Defendant subcontracted Schindler Elevator Corporation ("Schindler") to provide elevator maintenance services for the Triplex buildings.

Defendant hired Plaintiff in December 2002 as a Support Supervisor for the Triplex buildings.  In January of 2007, Plaintiff became the Building Manager for the CJC.  As Building Manager, Plaintiff was supervised by Kevin Smith, the Project Manager for the Triplex between 2003 and February 2016.  The Project Manager is the highest management position at the Triplex and is responsible for overseeing all USF employees and subcontractors.  Smith reported to USF's Vice President of Operations, Jim Dorris, who reported directly to USF's President and CEO, Jim Dobrowolski.

On February 29, 2016, at the recommendation of Len Gipson, the Deputy Commissioner for the City's Department of Public Property, Defendant promoted

---

[1]    This Court has also considered Defendant's reply.  [ECF 34].

[2]    These facts are taken from the parties' briefs, exhibits, and statements of facts.  To the extent that any facts are disputed, such disputes will be noted and, if material, will be construed in Plaintiff's favor pursuant to Rule 56.

Plaintiff to the role of Project Manager for the Triplex.  As a result, Defendant's previous Project Manager, Mr. Smith, transferred to another position in Maryland and no longer had any involvement with the Triplex project.  Plaintiff's promotion included a salary increase, a signing bonus, and an annual bonus of up to $10,000.

According to Plaintiff, sometime in late December of 2013, while he was Building Manager for the CJC, Plaintiff began reporting to his supervisors the lack of elevator maintenance being performed by the Schindler subcontractors.  Plaintiff testified that he was "continually complaining about the lack of elevator maintenance at the CJC building under Schindler elevator mechanics, and Schindler Elevator Company."  When asked to provide the specifics of his complaints, Plaintiff summarized them as follows:

> "The complaints would have been to Kevin Smith and Jim Dorris and Ed Siegler, my APM and bumped up to Jim Dorris and John Lontz, just constant complaint that whether verbally or in writing that elevator maintenance isn't being handled at the CJC building, preventative maintenance schedules aren't being completed, logbooks aren't being completed, and there's no presence of elevator mechanics in the building.  Those were the type of complaints I was making."

Plaintiff's former supervisor Smith testified that Plaintiff reported "noncompliance with the RFP on a number of occasions."  In particular, Smith testified that Plaintiff reported to him that the Schindler contractors were not making requisite maintenance entries into the logbook or providing preventative maintenance forms ("PM's").

In addition to this general testimony, Plaintiff points to the following written communications to his various supervisors in which he raised issues regarding elevator maintenance, as evidence of  his purported reports of wrongdoing and/or waste:[3]

- In a September 21, 2011 e-mail to his supervisors, Plaintiff recommended that "CJC Supervisor Mike Frye be issued a written warning for not completing his job assignments, and following through to make sure trades were completing their PM's on schedule."  Notably, Plaintiff's supervisors responded with support, one stating that "[Plaintiff] is correct."   (Pltf's Response, ECF 33, Ex. E).

- In a December 16, 2013 e-mail to Smith and Edward Siegler, Plaintiff reported that "staff elevator Car 2A is constantly going out of service two or three times a day . . . . Sheriffs have expressed a real safety concern/issue

---

[3]      As set forth more fully below, in order to maintain a claim under the Pennsylvania Whistleblower Law, a plaintiff must point to verbal or written reports of "wrongdoing" or "waste," as those terms are defined by the applicable statute.

because they are not able to get their Deputies up to the courtrooms when needed due to staff car constantly being out of service . . . . I've had several conversations with both Elevator mechanics the past month regarding this issue.  Schindler mechanics just keep telling me they are working on solving problem and have replaced different boards to Staff Car 2A."  (*Id.* at Ex. F).

- On January 29, 2014, Plaintiff reported in an e-mail to Smith, Siegler and others that one of the Schindler Elevator mechanics told him that "he is not currently doing the Triplex PM's because there are some tasks on the PM's that are printed from our work order system that don't correspond to the elevators?"  Plaintiff also reported that "right now, (CJC) we have no record of any monthly PM's being completed at CJC the past four to five months." (*Id.* at Ex. G).  In response to this report, Plaintiff testified that he received four months of "pencil-whipped" forms evidencing unspecified work on the elevators.  Plaintiff believed that these "pencil whipped" forms falsely documented maintenance work that had never been performed, but was being billed to the City, and reported this belief to Smith and Siegler.

- On May 29, 2014, Plaintiff reported in an e-mail to Smith and Siegler that "Schindler mechanics are not keeping the elevator log book updated in the penthouse machine room."  (*Id.* at Ex. J).

- On January 6, 2015, Plaintiff reported in an e-mail to John Lontz, Smith, Jim Dorris, and Siegler that Schindler had not completed any PMs "for any piece of conveying equipment at CJCJ for December."  (*Id.* at Ex. L).

- On February 5, 2015, Plaintiff reported in an e-mail to Siegler, Smith and others that:  "Schindler Mechanics handed me back all of January's PM's and work orders.  After reviewing them, there is no time on any of the work orders or PM's.  I am handing them back to Schindler to add the time that they spent on each work order and PM."  (*Id.* at Ex. N).

- On August 21, 2015, Plaintiff reported in an e-mail to Smith, Siegler, and others that:  "Public elevator 1B has been operating with problems and needs service.  Elevators position indicators need to be addressed on elevators too.  Tenants in building are extremely upset with the way the public elevators are being maintained.  Mechanics are aware of all issues." (*Id.* at Ex. O).

- On May 19, 2016, Plaintiff reported in an e-mail to John Shaughessy and Siegler that:  "Jerry's contingency on his signed invoices was based on PM's being completed and produced.  Jerry is not going to pay for drive invoices due to the fact that PM's were not completed under Schindler when they took over.  Jerry is searching for the flash drive that was provided from Kevin Smith, but that isn't going to persuade Jerry to pay back invoices,

because according to Jerry, PM's were not being completed as required under the contract." (*Id.* at Ex. P).

- On September 19, 2016, Plaintiff reported to Siegler, Dorris and others that: "At our 9-2-2016 staff meeting, it was stated that the onsite TKE mechanics were not completing monthly PM'S per their TKE Supervisor's instructions. Please be reminded, all scheduled elevator PM'S need to be completed as scheduled." (*Id.* at Exhibit T).

Defendant terminated its subcontract with Schindler in July 2016. On August 4, 2016, an elevator accident at the CJC resulted in serious injuries to a Sheriff's deputy.

On January 9, 2017, Plaintiff was called to a meeting with CEO Dobrowolski and Dorris, where Plaintiff was told that there had been complaints about his leadership and management style. Plaintiff was offered the choice of either remaining as Triplex Project Manager while being shadowed by Dorris, or to be demoted to his previous position as Building Manager for the CJC while remaining at his current salary. On January 31, 2017, Plaintiff attended another meeting with the same two individuals at which they asked Plaintiff if he would accept the demotion, and informed Plaintiff that the option of remaining as Triplex Project Manager was no longer being offered. Plaintiff protested that he was being treated in a manner fundamentally different than other employees were treated. He subsequently took approved vacation to tend to his wife's health. At or about the same time as these meetings, CEO Dobrowolski asked Plaintiff how old he was and how much longer he wanted to work.

On February 3, 2017, while on the approved vacation, Plaintiff was fired and replaced by someone three years younger. At the time, Plaintiff was 59 years old. In an affidavit, Plaintiff described the sequence of events related to his firing as follows:

"At this meeting, I was offered to remain as project manager with Jim Dorris shadowing me, or I could go back to the CJC Building Manager Position. I was given two days to come to a decision. This was the first time that any negative comments relative to my work performance were communicated to me by my CEO Dobrowolski or COO Dorris. On or around Friday, January 13, 2017, I did have a phone conversation with COO Jim Dorris regarding my employment situation. Dorris then said that a decision doesn't have to be made now "because you're doing an excellent job." Neither Dorris nor Dobrowolski got back to me until a meeting on 1-31-2017. At this meeting, the option of my remaining as Triplex Manager was removed, with my alternative only being returning to the CJC as building manager. During a telephone call with Mr. Dorris on 2-1-2017, I asked if I could have a few more days off for

5

a family matter.  Jim said fine, do what you need to do and he okayed my time off.  I advised him that I would be back on Wednesday, 2-8-2017 and I will put my out of office notice on my computer notifying everyone that I would be out until that time.  He thanked me and said I will see you next Wednesday the 8th.  USF subsequently gave me additional time to make my decision.  With respect to USF's correspondence to me, my Attorney responded back to USF via fax to USF CEO.  Simply stated, I never resigned my position and USF management knew this."

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 governs summary judgment motion practice.  Fed. R. Civ. P. 56.  Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Under Rule 56, the court must view the evidence in the light most favorable to the nonmoving party.  *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  *Id.* at 322.  After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence

6

or presence of a genuine dispute." Fed. R. Civ. P 56(c)(1)(A)-(B).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings.  *Celotex*, 477 U.S. at 324.  Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

**DISCUSSION**

Defendant moves for summary judgment on Plaintiff's Whistleblower and age-based discrimination claims on the ground that Plaintiff has failed to produce evidence sufficient to meet his summary judgment burden as to each of his claims.  In particular, with respect to Plaintiff's Whistleblower claims, Defendant contends that Plaintiff has not proffered evidence sufficient to show that he made the requisite reports of either "wrongdoing" or "waste" or that these reports were the cause of his termination.  With respect to Plaintiff's age discrimination claims, Defendant argues that Plaintiff has not presented evidence sufficient to demonstrate the requisite discriminatory animus and/or causation.  This Court will address the parties' arguments with respect to each of Plaintiff's remaining claims.

### *Plaintiff's Whistleblower Claims*

Under the Pennsylvania Whistleblower Law:

> [n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of

7

> wrongdoing or waste by a public body or an instance of waste by
> any other employer as defined in this act.

43 Pa. Con. Stat. § 1423(a).   As such, the Whistleblower Law "prohibits an employer from retaliating against an employee because of that employee's report of "wrongdoing" or "waste" by the employer, and the employee alleging a violation may bring a civil action for injunctive relief, or damages, or both. " *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015) (citing 43 Pa. Con. Stat. § 1423(a)).

Here, Plaintiff has alleged that for a period of years leading up to his termination, he made numerous reports to management and his superiors regarding a lack of preventive maintenance and/or deficiencies in the maintenance of the elevators at the Triplex buildings.   Most, if not all, of Plaintiff's alleged reports included his concerns or complaints with respect to the maintenance, or lack thereof,   necessary work and corresponding documentation, being performed by Defendant's elevator service subcontractor, Schindler.   Plaintiff claims that these complaints constitute the requisite reports of wrongdoing and/or waste and that his subsequent termination was in retaliation for these reports.

To sustain a claim under the Whistleblower Law, an employee "must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee . . . had reported or was about to report in good faith . . . an instance of wrongdoing or waste to the employer or an appropriate authority."  43 Pa. Stat. Ann. § 1424(b).   A plaintiff must also present evidence of a causal connection between his or her report and the alleged retaliation. *Golaschevsky v. Dep't of Envtl. Prot.*, 720 A.2d 757, 759–60 (Pa. 1998).   If a plaintiff satisfies these requirements, the burden shifts to the defendant employer to show that its actions were lawful. *O'Rourke v. Dep't of Corr.*, 778 A.2d 1194, 1200 (Pa. 2001).   A defendant is not liable "if the defendant proves by a

preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." 43 Pa. Con. Stat. § 1424(c).

Defendant moves for summary judgment on the grounds that Plaintiff cannot show that: (1) he made a report of "wrongdoing" or "waste" protected by the Whistleblower Law; and (2) there was any causal connection between Plaintiff's report(s) and his termination on February 3, 2017. Each of these arguments is addressed below.

### 1.    *Reports of Wrongdoing*

The Whistleblower Law does not protect every critical or damaging report that an employee makes or may make to or about his employer. Rather, it protects only reports of "wrongdoing" or "waste" falling within the statute's narrow definition of those terms. A plaintiff who asserts a Whistleblower claim must specify how his or her employer is guilty of waste or wrongdoing. *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994), *aff'd*, 669 A.2d 335 (Pa. 1995). "Wrongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Con. Stat. § 1422.

In order to make a prima facie case based on an alleged report of wrongdoing, Plaintiff must point to verbal or written reports he made of Defendant's violation of an identifiable statute, regulation, ordinance, or code of conduct or ethics. 42 Pa. Cons. Stat. §§1422 and 1424(b). Though Plaintiff need not have expressly cited to a statute or regulation in his reports, the *substance* of his reports must allege a violation of a *specific* legal or ethical authority. *Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 555-56 (Pa. Commw. Ct. 2016) ("The report [of wrongdoing] must provide information that is sufficient to identify the law allegedly violated; reports of vague

or subjectively wrong conduct are not considered wrongdoing under the [Pennsylvania] Whistleblower Law.") (internal citation omitted); *see also Riggio v. Burns*, 711 A.2d 497 (Pa. Super. Ct. 1998). In order to establish wrongdoing, an employee "must demonstrate [that he] made a report of some action by [his] employer . . . which, if proven, would constitute a violation of a law or regulation[;] . . . the report must be of an actual violation, not a potential or contemplated violation." *Greco v. Myers Coach Lines Inc.*, 199 A.3d 426, 434 (Pa. Super. Ct. 2018). Thus, "the Court must determine whether *the substance* of [the whistleblower's] complaints alleged a violation of a specific legal or ethical authority." *McAndrew v. Bucks Cty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 743 (E.D. Pa. 2016) (emphasis in original) (citing *Sukenik*, 131 A.3d at 556).

Notably, Plaintiff does not contend, nor could he, that any of his alleged reports cite violations of any specific statutes or regulations. In an attempt to meet his summary judgment burden, Plaintiff contends that his reports "involve[d] Defendant's failure to comply, not only with the City of Philadelphia's RFP requirements which reference pertinent codes and standards, but also with mandatory code requirements regarding the maintenance of elevator systems." (Pltf's Resp., ECF 33, at p. 20). The only pertinent code provisions that Plaintiff identified in his response, however, are those contained at 34 Pa. Code § 405, *et seq*., specifically §§ 405.7, 405.8, and 405.9. (*Id.* at pp. 20-21). Other than his mere reference to these three Pennsylvania Code provisions and his reports, Plaintiff provides no argument or evidence to support his conclusion that his reports constituted complaints of violations of these, or any other, provisions of the Pennsylvania Code. In the absence of any evidence and argument, Plaintiff has failed to meet his summary judgment burden as to the requisite reports of wrongdoing.

In any event, none of Plaintiff's purported reports about maintenance or reporting inadequacies could be interpreted as constituting complaints about violations of the Pennsylvania

Code provisions baldly cited in Plaintiff's response.  This chapter of the Pennsylvania Code governs "the construction, alteration, addition, repair, movement, equipment, removal, maintenance, use and change in use of every elevator and lifting device after April 9, 2004."  34 Pa. Code § 405.1.  The cited provisions do not require any specific maintenance, frequency of maintenance, or documentation thereof.[4]  Section 405.7 requires periodic inspections "at intervals that do not exceed 6 months."  34 Pa. Code § 405.7(a).  Section 405.8 requires certain periodic testing every three to five years.  *Id.* at § 405.8.  Section 405.9 requires "periodic dynamic testing [.]"  *Id.* at § 405.9.  Plaintiff has not pointed to any report that could be interpreted as substantively complaining about a violation of any of these provisions.  Moreover, as evidenced by documents that Plaintiff forwarded to upper management shortly after the August 2016 elevator accident, the elevators at the CJC *were* inspected every six months (as required) between October 2013 and June 2016, and passed inspection every time.  The requisite five-year periodic testing was also completed during the relevant time period, and the elevators passed that testing every time, as well.

In short, Plaintiff has failed to present evidence sufficient to show that he made reports of Defendant's failure to comply with any specific statute, regulation, ordinance, or code of conduct or ethics.  At best, Plaintiff's reports amount to complaints about inadequate maintenance and/or inadequate documentation of maintenance at the CJC.  Any such failures, however, were not

---

[4]       As pointed out by Defendant (though nowhere even referenced by Plaintiff), these provisions incorporate the standards contained in the American Society of Mechanical Engineers ("ASME") Safety Code for Elevators and Escalators (ASME A17.1-2000), including the 2002 supplement (ASME a17.1a-2002) (hereinafter the "ASME Code").  *See* 34 Pa. Code § 405.2(a)(1).  Section 8.6 of the ASME Code, which governs the maintenance, repair, and replacement of elevator equipment, does not mandate any minimum increment for elevator maintenance, maintenance documentation, or daily log book documentation.  Instead, the ASME Code states that components should be cleaned, lubricated, and adjusted at "regular intervals" and that the "frequency of periodic inspections and tests shall be established by the authority having jurisdiction."  Section 405.7 of the Pennsylvania Code requires periodic inspections "at intervals that do not exceed 6 months."  34 Pa. Code § 405.7(a).  As described above, none of Plaintiff's alleged reports complain of a failure to perform maintenance at the requisite intervals, and the undisputed evidence shows that Defendant's elevators were subjected to the required periodic testing.

reported as and, in fact, were not violations of the Pennsylvania Code provisions Plaintiff cited. As such, this Court finds that summary judgment in Defendant's favor is warranted with respect to any claims premised on alleged reports of wrongdoing.

### 2.    *Reports of Waste*

In order to make a prima facie case based on an alleged report of "waste," Plaintiff must point to verbal or written reports he made of Defendant's waste of the City's funds or resources. 42 Pa. Con. Stat. § 1424(b).  The statute defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."  *Id.* at § 1422.  Defendant argues that none of Plaintiff's reports constituted the requisite complaints of waste.  This Court disagrees.

To meet his burden as to waste, Plaintiff points to his reports to supervisors regarding the significant and repeated lack of maintenance that Schindler was required to perform on the Triplex elevators.  Under its fixed-price contract with the City, Defendant was required to provide various elevator maintenance services through Schindler.  Plaintiff's evidence, including his testimony and various e-mails, creates a genuine issue of material fact as to whether he reported that the services required under the City's fixed-price contract were not being provided, even though the City was ultimately paying for those services.  Construing the evidence in Plaintiff's favor, particularly the substance of Plaintiff's reports, this Court finds that such reports may constitute the requisite complaints of waste necessary to maintain claims under the Whistleblower Law.  *See Bailets*, 123 A.3d 308 (holding that a defendant's failure to perform services required under a fixed-price contract may constitute waste).[5]

---

[5]    This Court notes that Defendant provided evidence by way of Mr. Dobrowolski's affidavit that the City did not pay and has not paid for work done on the elevators at the MSP and OPB in 2015 and 2016 due to the purported lack of adequate or sufficiently detailed documentation corresponding to that elevator

### 3.      Causal Connection

Defendant argues that, even if Plaintiff met his burden with respect to reports of wrongdoing and/or waste, Plaintiff has not provided evidence sufficient to show the requisite causal connection between Plaintiff's reports of wrongdoing/waste and his termination.   In particular, Defendant argues that Plaintiff's promotion, which occurred less than a year before his termination, and the lack of temporal proximity between Plaintiff's alleged reports of wrongdoing/waste and his termination belie any reasonable inference that he was terminated in retaliation for his reports.  This Court agrees.

To sustain a claim under the Whistleblower Law, Plaintiff must point to "'concrete facts' to connect the report" of waste or wrongdoing to his subsequent termination.  *Golaschevsky*, 720 A.2d at 759 (quoting *Gray*, 651 A.2d at 225).  A prima facie case requires more than evidence of the mere fact that a report was made and followed by a termination.  *Lutz v. Springettsbury Twp.*, 667 A.2d 251, 254 (Pa. Commw. Ct. 1995).  Plaintiff "must come forward with some evidence of a connection between the report of wrongdoing [or waste] and the alleged retaliatory acts."  *Mosley v. City of Pittsburgh Pub. Sch. Dist.*, 702 F. Supp. 2d 561, 583 (W.D. Pa. 2010) (quoting *O'Rourke*, 778 A.2d at 1200); *see also Anderson v. Bd. of Sch. Dirs. of the Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 173 (3d Cir. 2014).  The connection "may not be predicated upon vague and inconclusive circumstantial evidence."  *Sea v. Seif*, 831 A.2d 1288, 1293 n.5. (Pa. Commw. Ct. 2003) (internal citation and quotation marks omitted).  Rather, Plaintiff "must show by concrete facts or surrounding circumstances that the report of wrongdoing or waste led to [his] dismissal, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed."  *Golaschevsky*, 720 A.2d

---

work.  However, construing the evidence in Plaintiff's favor at this stage, the City's payment for these services appears to be subject to a genuine dispute of material fact.

at 759 (internal citation and quotation marks omitted).   The standard for causation under the Pennsylvania Whistleblower statute is "more stringent than the one for a First Amendment retaliation claim." *Cavicchia v. Philadelphia Phila. Hous. Auth.*, 137 F. App'x 495, 497 (3d Cir. 2005).

After a thorough review of the record, this Court finds that there is insufficient evidence for a reasonable juror to find the requisite causal connection between Plaintiff's reports of wrongdoing/waste[6] and his termination.   As described above, Plaintiff points to his written and verbal complaints to supervisors between September 2011 and September 2016 as the protected activity underlying his Whistleblower claims.   At no time during that period did anyone threaten Plaintiff with repercussions for his reports, nor did anyone discourage Plaintiff from making those or any other reports.   To the contrary, Plaintiff's supervisors responded to his reports with support, even encouraging others' compliance with Plaintiff's suggestions.   For example, after Plaintiff raised concerns about communication issues he was experiencing with the Schindler contractors in February 2015, both Ed Siegler and John Lontz acknowledged Plaintiff's concerns and offered gratitude.   Mr. Lontz wrote:   "I do appreciate [Plaintiff's] commitment to this building and the need to make sure the PMs and repairs are being done."   Mr. Siegler thanked Plaintiff for his "much appreciated" thoughts.   After Plaintiff informed Mr. Siegler that the Schindler mechanics were not putting adequate details on the PM forms, Mr. Siegler again thanked Plaintiff and said he would look into the matter.   When CEO Jim Dobrowolski learned that the Schindler contractors were not filling out appropriate PM forms (as Plaintiff reported), Mr. Dobrowolski called a

---

[6]      As set forth above, this Court has found that Plaintiff has failed to meet his summary judgment burden with respect to any reports of wrongdoing, but that he has presented sufficient evidence at this stage to support the existence of reports of waste.   Under either theory, however, Plaintiff must demonstrate a causal connection between the reports of either wrongdoing or waste and his termination.   This Court finds no causal connection between any of Plaintiff's reports and his termination.

meeting to admonish the entire USF management team that this could not continue to happen. Plaintiff was not singled out or criticized at this or any other meeting.  Rather, Plaintiff's reports were acknowledged and commended by his supervisors.

Not only were Plaintiff's reports acknowledged and appreciated, in February 2016, Mr. Dobrowolski promoted Plaintiff and gave him a significant raise.  This promotion and the positive responses from Plaintiff's supervisors to his reports belie any notion that Plaintiff's termination a year after his promotion and at least five months after his last cited complaint was in retaliation for his reports.  *See Rink v. Ne. Educ. Intermediate Unit 19*, 2016 WL 3912985, at *8 (M.D. Pa. July 18, 2016) (granting summary judgment and finding the temporal proximity between plaintiff's protected activity and termination, which was "well over a year," insufficient for fact-finder to infer causation.); *Mosley*, 702 F. Supp. 2d at 588 (finding five-month gap between complaint and termination "is simply too remote to infer causation."); *Golaschevsky*, 683 A.2d at 1304 (finding no causal connection between report and termination four months apart); *Lutz*, 667 A.2d at 254 (finding lack of causation with four-month gap between report and termination); *Gray*, 651 A.2d at 255 (finding lack of causation with four-month gap between report and termination); *Bennett v. Republic Servs., Inc.*, 179 F. Supp. 3d 451, 456 (E.D. Pa. 2016) (finding no causal connection where the termination was within two months of the report); *Grim v. May Grant Assocs.*, 2019 WL 358520, at *6-7 (E.D. Pa. Jan. 29, 2019) (dismissing complaint for lack of causation where the termination was four months after the report).  As such, Plaintiff has failed to meet his summary judgment burden as to causation.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's Whistleblower claims is granted.

### *Plaintiff's Age Discrimination Claims*

At Counts III, IV, and V of the amended complaint, Plaintiff asserts age discrimination claims under the ADEA,[7] the PHRA,[8] and the Philadelphia Ordinance,[9] alleging that he was unlawfully terminated because of his age.  Defendant has moved for summary judgment on these claims on the basis that Plaintiff has not produced any evidence to support the requisite causal inference that he was terminated because of his age.  This Court agrees.

To maintain a viable age discrimination claim, a plaintiff must present evidence sufficient to show that:  (1) he is forty years of age or older; (2) the defendant took an adverse employment action against him; (3) he was qualified for the position from which he was removed; and (4) he "was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus."  *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995).[10]   Although there is no bright-line rule, "it is generally accepted that when the

---

[7]    The ADEA provides that: "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ."  29 U.S.C. § 623.

[8]    The PHRA provides:  "[i]t shall be an unlawful discriminatory practice . . . (a) For any employer because of the . . . age . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract."  43 Pa. Cons. Stat. § 955.

[9]    The Philadelphia Ordinance provides: "[i]t shall be an unlawful employment practice to deny or interfere with the employment opportunities of an individual based upon his or her  . . . age . . . ."  Phila. Code § 9-1103.

[10]    The United States Court of Appeals for the Third Circuit has stated "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  *Fasold*, 409 F.3d at 184 n.8 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)).  Finding no such distinguishing language, the Third Circuit has interpreted the relevant provisions of the ADEA and the PHRA "as applying identically . . . and as being governed by the same set of decisional law."  *Id.* (citing *Fogleman*, 283 F.3d at 567).

difference in age between the fired employee and his or her replacement is fewer than five or six years, the replacement is not considered 'sufficiently younger,' and thus no prima facie case is made." *Gutknecht v. SmithKline Beecham Clinical Labs., Inc.*, 950 F. Supp. 667, 672 (E.D. Pa. 1996); *see also Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n.9 (3d Cir. 2000) (affirming dismissal of age discrimination claims where employees who were selected were eight and three years younger than plaintiff); *Emmett v. Kwik Lok Corp.*, 2012 WL 4009721 (E.D. Pa. Sept. 11, 2012), *aff'd* 528 F. App'x 257 (3d Cir. 2013) (dismissing age discrimination claim where plaintiff's position was filled with consolidation of other employees whose average age was five years younger than plaintiff); *Fitzpatrick v. Nat'l Mobile Television*, 364 F. Supp. 2d 483, 491-92 (M.D. Pa. 2005) (dismissing plaintiff's age discrimination claim where plaintiff was replaced by employee who was four years younger). Alternatively, the fourth element can be satisfied by facts which, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (quotation marks and citations omitted).

Here, it is undisputed that Plaintiff's replacement was only three years younger than Plaintiff. In light of this undisputed fact, Plaintiff cannot meet his prima facie case for age discrimination by pointing to the age of his replacement. To meet his burden, therefore, Plaintiff points solely to his contention that Mr. Dobrowolski asked him, during a meeting, "how old he was and how much longer he wanted to work." Defendant argues that this inquiry was permissible and not indicative of the requisite discriminatory intent. This Court agrees.

Numerous courts have found that an employer's inquiry about an employee's retirement plans is generally not evidence of age discrimination. *See Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004) (holding that retirement question was not direct evidence of age

discrimination, as that question "could just as easily be explained by a desire on [defendant's] part to do some long-term planning."); *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 28 (1st Cir. 1995) ("[A] single inquiry by an employer as to an employee's plans for retirement does not necessarily show animosity towards age."); *Kopko v. Lehigh Valley Health Network*, 2016 WL 6442062, at *7 (E.D. Pa. Oct. 31, 2016) (granting employer summary judgment on age discrimination claim and finding employer's inquiry about plaintiff's retirement plans insufficient to demonstrate age animus); *Romantine v. CH2M Hill Eng'rs, Inc.*, 2010 WL 5419017, at *13 (W.D. Pa. Nov. 24, 2010) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees for purposes of succession planning or to address rumors concerning retirement for purposes of staffing.").  Here, the context surrounding Dobrowolski's inquiry as to Plaintiff's age demonstrates no age bias on the part of Dobrowolski.

As described above, at the meeting at issue, Dobrowolski, who had promoted Plaintiff to his then-current position just one year earlier, advised Plaintiff of complaints that had been made against him, and then offered Plaintiff the option of retaining his current job, but under additional supervision, or transferring back to his former position as a Building Manager, but also at his then-current salary.  Plaintiff does not dispute these facts and gave the following further description of that meeting:

> I told both of them (CEO and VP) that this was exactly what I predicted what was going to happen exactly one year ago when CEO offered me the PM position.  CEO then said that he didn't want to hurt me this late in my career and asked me how old I was and how much longer did I want to work?  I informed CEO that I still had a number of years ahead of me and that I was still relatively young. CEO said for me to go home and talk to your wife and get back to them later in the week.  CEO and VP Dorris said don't let my "ego" get in the way, that I have nothing to be ashamed about.  CEO even said that he would come down and talk to Management staff and present it in a way that I gave it a try as a favor to (CEO) and I didn't like the position and wanted to go back to CJC as a BM.

In the undisputed context surrounding Dobrowolski's statement, including, in particular, his offer to Plaintiff to remain at the same job, under additional supervision, but at the same salary, or to transfer to his former position at his then-current salary, demonstrates no age bias on the part of Dobrowolski.   As such, Plaintiff has not met his burden of demonstrating that his age was the cause of his termination.   Accordingly, Defendant's motion for summary judgment on Plaintiff's age discrimination claims is granted.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiff's age discrimination claims at Counts III, IV, and V, and his Whistleblower claim at Count VII, and judgment is entered in favor of Defendant on these claims.   An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO,* U.S.D.C. J.